FILED
2022 Mar-25  PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **LATOYA JAMES,** | } | |
| **o.b.o., B.R.** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | **Case No.:  4:20-cv-00937-MHH** |
| **v.** | } | |
| | } | |
| **Kilolo Kijakazi,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 405(g), Latoya James, on behalf of B.R., a child under the age of eighteen, seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Ms. James's claim on behalf of B.R. for supplemental security income, finding that B.R. had not been under a disability since September 13, 2017.  Ms. James argues that she is entitled to relief because the Administrative Law Judge – the ALJ – erroneously rejected the opinions of the

---

[1] The Court asks the Clerk to please substitute Kilolo Kijakazi for Nancy Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer leaves office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

Commissioner's expert without good cause and without clearly stating grounds for repudiating the opinions. Ms. James also argues that ALJ's decision is not supported by substantial evidence. After careful review, the Court affirms the Commissioner's decision.

## Procedural Background

Ms. James applied for supplemental security income on September 13, 2017. (Doc. 9-3, p. 11). Ms. James alleged that her son's disability began August 9, 2016. (Doc. 9-3, p. 11). The Commissioner initially denied Ms. James's claim on January 3, 2018. (Doc. 9-5, pp. 2-5). Ms. James requested a hearing before an ALJ. (Doc. 9-5, pp. 8-10). The ALJ held a hearing and issued an unfavorable decision on October 10, 2019. (Doc. 9-3, pp. 8-24). On June 12, 2020, the Appeals Council declined Ms. James's request for review, making the Commissioner's decision final and proper for the Court's review. (Doc. 9-3, pp. 2-4); *see* 42 U.S.C. § 405(g) and 1383(c).

## Standard of Review

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

**Statutory and Regulatory Framework**

An ALJ follows a three-step sequential evaluation process to determine whether

an individual under the age of 18 is disabled.  20 C.F.R. § 416.924(a).  At step one, an

ALJ must determine if the child is engaged in substantial gainful activity.

> Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in substantial gainful activity. 20 C.F.R. §§ 416.974, 416.972(a). If the claimant is working and the work is substantial gainful activity, the Commissioner will find that the claimant is not disabled, regardless of claimant's medical condition or his age, education, or work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the individual is not engaging in substantial gainful activity, the analysis proceeds to the next step.

*Daniel ex rel. C.P.D. v. Colvin*, 2104 WL 931951, *2 (N.D. Ala. March 10, 2014); *see*

*also* 20 C.F.R. §§ 416.924(b)(determining disability for children; "If you are working and

the work you are doing is substantial gainful activity, we will find that you are not disabled

regardless of your medical condition or age, education, or work experience.").

If the child is not engaged in substantial gainful activity, then the ALJ must

determine whether the child suffers from a severe impairment or combination of

impairments that cause more than minimal functional limitations.  20 C.F.R. § 416.924(a)

and (c).  An ALJ must consider all of the evidence in the child's case record.  20 C.F.R.

§ 416.924a(a).  The evidence in the case record "may include information from medical

sources (such as your pediatrician or other physician; psychologist; qualified speech-

language pathologist; and physical, occupational, and rehabilitation therapists) and

nonmedical sources (such as your parents, teachers, and other people who know you)."

20 C.F.R. § 416.924a(a).  The regulation that governs "considerations fin determining disability for children" provides:

> Every child is unique, so the effects of your impairment(s) on your functioning may be very different from the effects the same impairment(s) might have on another child. Therefore, whenever possible and appropriate, we will try to get information from people who can tell us about the effects of your impairment(s) on your activities and how you function on a day-to-day basis. These other people may include, but are not limited to:
>
> i.    Your parents and other caregivers. Your parents and other caregivers can be important sources of information because they usually see you every day. In addition to your parents, other caregivers may include a childcare provider who takes care of you while your parent(s) works or an adult who looks after you in a before-or after-school program.
>
> . . .
>
> iii.  School. If you go to school, we will ask for information from your teachers and other school personnel about how you are functioning there on a day-to-day basis compared to other children your age who do not have impairments. We will ask for any reports that the school may have that show the results of formal testing or that describe any special education instruction or services, including home-based instruction, or any accommodations provided in a regular classroom.

20 20 C.F.R. § 416.924a(a)(i), (iii).

If the child suffers from a severe impairment or combination of impairments that has lasted or is expected to continue for a continuous period of at least 12 months, then the ALJ must determine whether the child's impairments meet, medically equal, or functionally equal an impairment listed under Appendix I to the Subpart P of Part 404. 20 C.F.R. § 416. 924(a), (d).  To determine if a child's impairment functionally equals

the listings, the Commissioner must decide if the impairment is of "listing-level severity." 20 C.F.R. § 416.926a(d).  A child's impairment is of "listing-level severity if [the child has] marked limitations" in two of the following [six domains] "or an extreme limitation in [one of the following] domain[s]": "(1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being." 20 C.F.R. § 416.926a(d), (b)(1)(i)-(vi).  When assessing whether a child has "marked" or "extreme" limitations, the Commissioner must "consider all of the relevant information in [the claimant's] case record" concerning all medically determinable impairments.  20 C.F.R. § 416.926a(g)(3).  The Commissioner also must consider "the interactive and cumulative effects" of an impairment or multiple impairments in "any affected domain(s)."  20 C.F.R. § 416.926a(c).

With respect to benefit applications on behalf of children, in *Sullivan v. Zebley*, the United States Supreme Court stated:  "a child is entitled to benefits if his impairment is as severe as one that would prevent an adult from working."  493 U.S. 521, 529 (1990). The Supreme Court explained:

> The Secretary's test for determining whether a *child* claimant is disabled is an abbreviated version of the adult test. A child qualifies for benefits if he "is not doing any substantial gainful activity," § 416.924(a), if his impairment meets the duration requirement, § 416.924(b)(1), and if it matches or is medically equal to a listed impairment, §§ 416.924(b)(2) and (3). In evaluating a child's claim, both the general listings and a special listing of children's impairments, 20 CFR pt. 404, subpt. P, App. 1 (pt. B) (1989), are considered. If a child cannot qualify under these listings, he is

denied benefits. There is no further inquiry corresponding to the fourth and fifth steps of the adult test.

493 U.S. at 526 (1990) (emphasis in *Sullivan*).

## Summary of the ALJ'S Decision

The ALJ found that B.R., who was born on June 29, 2008, had not engaged in substantial gainful activity since September 13, 2017, the alleged onset date. (Doc. 9-3, p. 14). The ALJ determined that B.R. had been suffering from the severe impairments of attention deficit hyperactivity disorder (ADHD), nightmare disorder, oppositional defiant disorder, history of auditory and visual hallucinations, anxiety, and speech impairment. (Doc. 9-3, p. 14). *See* 20 C.F.R. § 416.924(c). B.R had the non-severe impairments of mild intermittent asthma and eczema. (Doc. 9-3, p. 14). Based on a review of the administrative evidence, the ALJ concluded that B.R. was less than marked in acquiring and using information and attending and completing tasks. (Doc. 9-3, pp. 19-20). B.R. had marked limitations in interacting and relating with others, no limitations in moving about and manipulating objects or caring for himself, and no limitations in health and physical well-being. (Doc. 9-3, pp. 21-24). Consequently, the ALJ concluded that B.R. did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 9-3, p. 14).

**Evidence in the Administrative Record**

*Administrative Hearing*

B.R.'s administrative hearing took place on August 8, 2019.  (Doc. 9-3, p. 41).  Ms. James testified on behalf of B.R. during the hearing.  At the beginning of the hearing, Ms. James's attorney noted "concern about the [consultative examination] by the administration in Exhibit 6F."  (Doc. 9-3, p. 46).  The examination to which Ms. James's attorney referred was conducted by Dr. Martha Kennon, the Commissioner's psychological expert.  (Doc. 18-1, p. 129).  Ms. James's attorney stated the evaluation "should have contained a child mental source statement instead of an adult mental source statement . . . I'm not really objecting.  I just want to note my concern for the record." (Doc. 9-3, p. 46).  The ALJ replied, "I don't think it's appropriate . . . to pay a consultative examiner a fee for providing what turns out to be pretty much a worthless examination." (Doc. 9-3, p. 46).  The ALJ explained that he would consider whether there was enough evidence in the record for him to make a decision based on B.R.'s treatment records. (Doc. 9-3, p. 46).

Ms. James testified that B.R. was not living with her at the time of the hearing because DHR had placed B.R. with his siblings' grandmother under a safety plan.  (Doc. 9-3, p. 43).  Ms. James's attorney pointed out that B.R. was "11 years old.  He suffer[ed] from ADD, ADHD, [and] oppositional defiant disorder."  (Doc. 9-3, p. 47).  Ms. James's

attorney also noted that B.R. had a diagnosis of specified schizophrenia or other psychotic disorder, eczema, and asthma. (Doc. 9-3, p. 47).

Concerning B.R.'s behavior at school, Ms. James testified that she received complaints that B.R. had trouble staying seated and that he picked fights with other students. (Doc. 9-3, pp. 48, 53-54). Ms. James testified that B.R. was in fifth grade, and he already had attended two other schools. (Doc. 9-3, pp. 48, 59). Ms. James explained that B.R. attempted to play organized sports, but he was kicked off the team because he cursed and misbehaved. (Doc. 9-3, p. 49). B.R.'s attorney had observed B.R. in the lobby and noted that he was shaking on Ms. James a lot. (Doc. 9-3, p. 49). Ms. James stated that she frequently struggled with that behavior with B.R. (Doc. 9-3, p. 49).

Ms. James testified that B.R. had not been evaluated at school for accommodations. (Doc. 9-3, p. 48). Consistent with a notation in one of B.R.'s medical records, Ms. James testified that B.R. had a problem with his speech and that his speech was slightly worse than her four-year-old's speech. (Doc. 9-3, p. 51). Ms. James explained that she spoke to B.R.'s school about putting him in speech therapy, but the school thought that B.R.'s speech was affected by his tonsils. (Doc. 9-3, p. 52).

The ALJ noted that B.R.'s grades during first-grade were "average." (Doc. 9-3, p. 58). The ALJ also indicated that B.R. was held back in the second grade. (Doc. 9-3, p. 58). Ms. James testified that because B.R. moved from Birmingham to Gadsden, he struggled in school that year. (Doc. 9-3, p. 59). Ms. James stated that the school had not

held B.R. back since he was in the second grade.  (Doc. 9-3, 59).  During the hearing, the
ALJ noted that B.R.'s third grade teacher indicated that B.R. was:

> [f]unctioning above average in reading and math and written language. Well,
> in English, he was on grade level. Math he was above grade level, and above
> grade level on reading. [Regarding his attention and ability to complete]
> tasks, she reported no problems there. Then they asked her about his ability
> to interact and relate with others, and she reported no problems. They asked
> her about caring for himself, and she reported that there were no problems.

(Doc. 9-3, pp. 59-60).  Ms. James explained that B.R.'s third grade teacher "called all the
time and said that [B.R.] was acting out."  (Doc. 9-3, p. 60).  The ALJ noted that B.R.'s
report card indicated that B.R. received a "B" in conduct.  (Doc. 9-3, p. 60).  When asked
if B.R.'s home life was negatively influencing his ability to function, Ms. James said no.
(Doc. 9-3, p. 61).

Ms. James testified that at home, she had tried to punish B.R. but it had not helped.
(Doc. 9-3, p. 49).  When asked if B.R. was sleeping normally, Ms. James testified that at
night B.R. walked and paced, had bad dreams, and hallucinated.  (Doc. 9-3, pp. 49-50).
Ms. James explained that B.R. was not receiving mental health treatment because the
doctor's office would call and change the appointment or say that "a counselor [was]
going to come out[,] and no one [came out]."  (Doc. 9-3, p. 50; *see also* Doc. 9-3, pp. 55-
56).   Additionally, Ms. James testified that B.R. was hospitalized because of
hallucinations.  Ms. James explained that B.R. saw things on a TV that was not on, saw
ants and spiders crawling and birds on the ceiling, and heard people walking up and down
the stairs.  (Doc. 9-3, pp. 50, 55).

10

When asked about B.R.'s ability to dress himself, Ms. James noted that she picked out clothes for him because he would choose clothes that did not match or were too small for him.  (Doc. 9-3, p. 52).  Pertaining to B.R.'s ability to use the bathroom, Ms. James stated that he "ha[d] a problem with his stool" because he held it and was scared that his stool was going to hurt him.  (Doc. 9-3, p. 52).  Ms. James explained that B.R. had an accident once because of constipation and now "[h]e won't go normally."  (Doc. 9-3, p. 52).

Concerning B.R.'s ADD and ADHD, Ms. James testified that B.R. did not listen and was forgetful.  (Doc. 9-3, p. 53).  Ms. James stated that B.R. struggled even when he was using medication.  (Doc. 9-3, p. 53).  When questioned about his ability to complete homework, Ms. James explained that while B.R. had a hard time staying seated, he could "sort of" follow instructions and get through his homework.  (Doc. 9-3, p. 54).  Ms. James indicated that B.R. could maintain friendships but occasionally said inappropriate things.  (Doc. 9-3, p. 54).  And B.R. was able to read but had difficulty keeping up with movies without asking a lot of questions.  (Doc. 9-3, p. 54).  Since his hospitalization for hallucinations, B.R. had told Ms. James that he stills heard noises, had bad dreams, and saw things.  (Doc. 9-3, p. 55).

*Medical Evidence*

On October 31, 2012, when B.R. was four years old, he visited Dr. Lane Schmitt for a speech-language evaluation at the request of Disability Determination Services.

(Doc. 18-1, p. 3). Dr. Schmitt noted that Ms. James reported that she carried B.R. to full term, that B.R. was born by cesarean section weighing six pounds and eight ounces, and that B.R. reached his developmental milestones later than she expected. (Doc. 18-1, p. 3). Ms. James explained that B.R. did not have a history of hearing problems, but she became concerned about his speech development around the age of three years old because "he wasn't saying his words properly." (Doc. 18-1, p. 3). She noted that B.R. had failed a speech screening in July of 2012 but had not had speech therapy. (Doc. 18-1, p. 3). Ms. James stated that B.R.'s teachers had difficulty understanding him. (Doc. 18-1, p. 3). She also indicated that B.R. choked easily. (Doc. 18-1, p. 3).

Dr. Schmitt administered the Arizona Articulation Proficiency Scale, Third Revision (AAPS-3), to identify B.R.'s misarticulations and total articulatory proficiency. (Doc. 18-1, p. 3). B.R. had a total score of 63.5, a standard score of 75, a percentile ranking of 4, and a Z core of -1.7. (Doc. 18-1, p. 4). B.R.'s impairment rating was "[m]oderate, considering sounds in single-word testing as well as informal conversational speech assessment." (Doc. 18-1, p. 4). B.R.'s speech intelligibility was difficult, with 39% of his errors in the area of sound distortions, 36% of his errors in the area of sound substitutions, and 25% of his errors in the area of omissions. (Doc. 18-1, p. 5). The AAPS-3 revealed that, "[s]even of the 28 errors included sounds a child [B.R.'s] age should make correctly []; however, the remaining 21 sounds are typically not mastered until a child is older." (Doc. 18-1, p. 4). Dr. Schmitt reported that some of the error

patterns "may be related to dialectal difference" and that 75-80% of B.R.'s conversational speech was intelligible.  Dr. Schmitt estimated that [B.R.] would be "60% intelligible to the untrained familiar listener."  (Doc. 18-1, p. 5).[2]

Dr. Schmitt also administered the Preschool Language Scale- Fourth Edition or PLS-4.  B.R. received a total language score of 85 which produced an age-equivalent total language score of "3 years, 4 months."  (Doc. 18-1, p. 5).  Dr. Schmitt stated that B.R.'s score of standard score of 78 suggested that B.R. was "functioning at a level approximately 23% or 12 months below his chronological age of 52 months."  (Doc. 18-1, p. 5).  B.R.'s "Auditory Comprehension [] score of 75" suggested that B.R. was "functioning approximately 25% or 13 months below his chronological age," and "his Expressive Communication [] score of 85 suggest[ed] functioning 13% or [seven] months below his chronological age."  (Doc. 18-1, p. 5).  As a result, Dr. Schmitt opined that B.R. had a "mild delay in expressive language development and a mild-to-moderate delay in receptive language development.  (Doc. 18-1, p. 5).

Dr. Schmitt reported that B.R. had trouble identifying colors and categories of objects in pictures.  (Doc. 18-1, p. 5).  B.R. used the pronoun "hers."  (Doc. 18-1, p. 5).  Dr. Schmitt concluded that B.R. had "moderate delay in articulation skill development, a mild-to-moderate delay in receptive language development and a mild delay in expressive

---

[2] Dr. Schmitt indicated that B.R. "was able to sit at the table for much of the evaluation, benefitting from stickers and the promise of playtime following table work."  (Doc. 18-1, p. 3; *see also* Doc. 18-1, p. 6).

language development." (Doc. 18-1, p. 6). B.R.'s conversational speech was "characterized by substitutions, distortions and omissions." (doc. 18-1, p. 6). Dr. Schmitt opined that B.R. was "an excellent candidate for speech therapy." (Doc. 18-1, p. 6).

Several years later, on March 16, 2016, B.R. was admitted to Grandview Medical Center for observation after he experienced auditory and visual hallucinations. (Doc. 18-1, p. 11).[3] He was seven years old and in the first grade. (Doc. 18-1, pp. 20, 82). Drs. Callahan and Daw treated and observed B.R. at Grandview for eight days. Dr. Callahan's discharge notes reflect that on admission, Ms. James brought B.R. to into the emergency room because she was concerned about behavior changes: B.R. had not slept well in at least two months, he was frequently awake at night walking through the house, and on the morning of admission, B.R. told his mother, "'mosquitos are coming out of the TV set, and red rabbits are talking to me. Mosquitos are coming out of my ears and my brother's ears.'" (Doc. 18-1, p. 38). Dr. Callahan reported that B.R. did not have prior inpatient psychiatric treatment and that his physical examination was unremarkable. (Doc. 18-1, p. 38). Dr. Callahan noted that B.R. was "somewhat hyper, fidgety, and restless," and B.R.'s speech was very difficult to understand, other than B.R.'s statements that "'the bugs I saw at home are gone right now.'" (Doc. 18-1, p. 38; *see also* Doc. 18-1, p. 14 (noting distraction, anxiety, irritability, disruptive behavior, and impulsive

---

[3] One day earlier, CED Mental Health Center had recommended inpatient treatment because B.R. was experiencing significant hallucinations. (Doc. 18-1, p. 79).

behavior); Doc. 18-1, p. 16 (noting poor impulse control, poor boundaries, but compliant with instructions and interventions)).

On March 17, 2016, B.R. attended group meetings with a recreation therapist and an occupational therapist.  B.R.'s group notes reflect that B.R was anxious, attentive, and cooperative.  B.R. needed prompting but did well with some 1:1 help. (Doc. 18-1, p. 52).

On March 18, 2016, Dr. Callahan's progress notes reflect that B.R. complained of bad dreams the night before.  B.R. stated that he had vomited before Dr. Callahan's visit with him, but he felt better.  (Doc. 18-1, p. 33).  Dr. Callahan noted that B.R. was drowsy, had poor hygiene, and had rapid speech, but he seemed to be in a happy mood.  (Doc. 18-1, p. 33).  Dr. Callahan reported that B.R. was not suicidal or homicidal.   (Doc. 18-1, p. 34).  Morning group notes reflect that B.R. was in bed for recreational therapy and sick during occupational therapy.  (Doc. 18-1, pp. 48, 52).  In the afternoon, B.R. appeared anxious, but cooperative and attentive.  He worked on a craft during group time.  (Doc. 18-1, pp. 47-48).

On March 19, 2016, Dr. Daw examined B.R. and noted that B.R. was overly active, cooperative, and alert.  B.R. did not report hallucinations.  Dr. Daw diagnosed B.R. with ADHD.  (Doc. 18-1, pp. 31-32).  Dr. Daw visited with B.R. again the following day.  Dr. Daw discussed B.R.'s treatment with staff, who reported that B.R. had slept well and earned stars.   Dr. Daw reported that B.R. was in a good mood, that he denied hallucinations, and that his insight and judgment were fair.  (Doc. 18-1, pp. 29-30).  B.R.

participated in a group meeting to learn about setting goals and understanding his feelings and emotions.  Group notes reflect that B.R. felt mad and wanted to go home.  B.R. appeared to enjoy group exercise, but he was tired and left a game to go to his room.  (Doc. 18-1, p. 46).  On March 21, 2016, B.R.'s group notes indicate that he was more attentive and cooperative.  B.R. was talkative and needed prompting and assistance finishing his project.  (Doc. 18-1, pp. 44-46).

Dr. Callahan saw B.R. on March 22, 2016.  Dr. Callahan noted that B.R. seemed "quiet and somewhat anxious."  (Doc. 18-1, p. 25).  Dr. Callahan reported that B.R. continued to experience auditory hallucinations, but B.R. did not report visual hallucinations.  B.R. showed no signs of being a risk of harm to himself or others.  (Doc. 18-1, pp. 26-27).  On March 23, 2016, Dr. Callahan reported that B.R. was able to complete psychiatric testing.  Dr. Callahan reported that the testing revealed mostly anxiety.  B.R. stated "the mosquitos are flying around at night."  (Doc. 18-1, p. 20).  Dr. Callahan indicated that B.R.'s speech was rapid, his mood was happy, and he had difficulty following conversations.  (Doc. 18-1, p. 21).  Dr. Callahan noted also that B.R. showed improvements in judgment and insight.  (Doc. 18-1, p. 22).  Group notes from that day reflect that B.R. had minimal participation in group meetings.  B.R. stayed in his bedroom for one meeting, he answered few questions in another group because he did not understand most questions, he sat quietly through another group meeting on crisis

management plans, and he did not want to follow directions in occupational therapy. (Doc. 18-1, pp. 41-44).

On March 23, 2016, B.R. was attentive and cooperative.  In occupational therapy he worked hard on a picture and showed it to almost everyone in group.  In recreational therapy, B.R. was able to stay on task and showed no aggression.  (Doc. 18-1, pp. 39-41).

Dr. Callahan discharged B.R. on March 24, 2016.  B.R.'s diagnoses were Generalized Anxiety Disorder and a history of psychosis.  (Doc. 18-1, p. 37; *see also* Doc. 18-1, p. 81).  At discharge, B.R. had prescriptions for Risperdal, Intuniv, and Trazadone, and instructions to follow up for aftercare with CED Mental Health Center.  (Doc. 18-1, p. 37).  Risperdal is prescribed to treat certain mood disorders by helping to restore the balance          of          certain          natural          substances          in          the          brain, https://www.webmd.com/drugs/2/drug-9846/risperdal-oral/details#:~:text=Risperidone%20is%20used%20to%20treat,take%20part%20in%20everyday%20life. (last visited March 25, 2022); Intuniv treats ADHD, https://www.webmd.com/drugs/2/drug-152956/intuniv-er-oral/details (last visited March 23, 2022); and Tradazone treats depression, https://www.webmd.com/drugs/2/drug-11188/trazodone-oral/details (last visited March 25, 2022).

B.R. visited CED Mental Health Center on March 28, 2016 for a three-day follow up to his inpatient treatment at Grandview.  (Doc. 18-1, p. 77).  Ms. Jenkins conducted an intake interview and noted that B.R. was in a good mood, but he continued to hear people

running downstairs, and he was being bullied in school.  (Doc. 18-1, p. 77).  On a patient health questionnaire, B.R. reported little interest in activities; feeling down, depressed, and hopeless; and having trouble concentrating.  (Doc. 18-1, p. 78).  B.R. reported either moving and speaking noticeably slowly or being very fidgety and restless.  (Doc. 18-1, p. 78).  Ms. Jenkins noted that B.R.'s appearance, relationship to the interviewer, motor activity, mood, thought process, thought content, and memory were good or okay.  (Doc. 18-1, p. 80).  Ms. Jenkins described as significant problems with visual and auditory hallucinations and anxiety.  (Doc. 18-1, pp. 80, 84, 87).  Ms. Jenkins explained that B.R. did not fit the dangerous criteria.  Ms. Jenkins noted that B.R. had ADHD with trouble focusing and impulsiveness, and he had trouble with his speech.  (Doc. 18-1, p. 84, 87).  Ms. Jenkins wrote that B.R. had diagnoses of anxiety and psychotic disorders from Grandview and ADHD from Children's PC Clinic.  (Doc. 18-1, p. 84).  Ms. Jenkins indicated that B.R. had a "suspected learning disability."  (Doc. 18-1, p. 84).  B.R. was fighting with peers and school staff.  (Doc. 18-1, pp. 85, 87).  Ms. Jenkins diagnosed B.R. with Other Specified Schizophrenia or Other Psychotic Disorder and ADHD and recommended individual and group therapy.  (Doc. 18-1, p. 88).  Dr. Feis concurred in the diagnosis.  (Doc. 18-1, p. 88).

On April 27, 2016 B.R. missed an appointment at CED.  A social worker, Randle Simmons, noted that the therapist tried to contact B.R by telephone but was unsuccessful.  (Doc. 18-1, p. 76).  On May 3, 2016, B.R. visited CED for his first appointment.  The

physician's evaluation form notes that the hospital discharge medications appeared to be working fairly well.  B.R.'s mood was described as euthymic, his sleep pattern as normal, his insight as poor, his judgment as fair, his thought process as logical, his attention/concentration as adequate, and his behavior as appropriate.  (Doc. 18-1, p. 75). B.R. continued to report audio and visual hallucinations.  (Doc. 18-1, p. 75).  The record of the visit indicates that B.R. was to discontinue guanfacine (Intuniv) and begin using Trileptal.  (Doc. 18-1, p. 75).  Both medications treat ADHD.[4]

B.R. missed two more appointments with CED on June 1, 2016 and July 29, 2016. Mr. Simmons noted that the therapist attempted unsuccessfully to contact B.R. by telephone about the missed appointments. The therapist mailed a letter for B.R. to contact CED to reschedule.  (Doc. 18-1, pp. 73-74).  On August 3, 2016, a therapist spoke with Ms. James regarding B.R.'s appointment with Dr. Grant the following day.  The therapist also reminded Ms. James of B.R.'s August 31, 2016 appointment with a therapist.  The therapist explained the importance of seeing therapists consistently in between appointments with the physician.  Ms. James reported that B.R. had done well on the medications, but he needed it especially when in school.  (Doc. 18-1, p. 72).

---

[4] Trileptal is "an anti-seizure medication used to stabilize the levels of electrical activity in the brain.  It is most often prescribed to patients who have ADHD combined with oppositional defiant disorder (ODD)."  https://www.streetdirectory.com/etoday/-eaaojp.html (last visited on March 25, 2022).

Dr. Kennon conducted a psychological evaluation on B.R. on November 30, 2017 at the request of Disability Determination Services. (Doc. 18-1, p. 129). At the time, B.R. was in third grade. (Doc. 18-1, p. 129). Dr. Kennon reported that B.R.'s reason for filing a disability claim was anxiety, paranoia, ADHD, and a speech problem. (Doc. 18-1, p. 129). Dr. Kennon noted that B.R. was late to walk, talk, feed himself, and dress himself. (Doc. 18-1, p. 129). Dr. Kennon reported that B.R. had issues with his temper as he "[s]tomps off, gets mad, slams doors, and fights at school." (Doc. 18-1, p. 1129). Dr. Kennon explained that B.R. had been treated for emotional issues, noting his stay at Grandview after his hallucinations of seeing ants and birds in his house. (Doc. 18-1, p. 129). She explained that B.R. slapped at ants on his sibling, claimed to have ants in his ear, and tried to stab the ants. (Doc. 19-1, p. 129).

Regarding B.R.'s mental status, Dr. Kennon reported that B.R. was oriented to person and place, that she noted no gross or fine motor issues, that his demeanor was okay, and his behavior was age appropriate. (Doc. 18-1, p. 130). Dr. Kennon reported that B.R.'s speech was difficult to understand with mispronunciations noted. Dr. Kennon indicated that B.R. slept eight hours each day and that B.R. was playful and smart. (Doc. 18-1, p. 130). B.R. denied suicidal and homicidal ideations. B.R. reported auditory and visual hallucinations but denied delusions. (Doc. 18-1, p. 130). B.R. stated that he feared and had nightmares about scary movies and had phobias of monsters, clowns, gorillas, wolves, bears, and cheetahs. (Doc. 18-1, p. 131). Dr. Kennon reported that B.R.'s thought

process was normal, noting neither loose, rambling, tangential, nor circumstantial thoughts. (Doc. 18-1, p. 131). In terms of cognition, B.R. "was able to count backward from 100 to 95 and count from 1-20 [and] [] perform other simple arithmetic calculations without error." (Doc. 18-1, p. 131). Regarding attention and memory, Dr. Kennon reported that B.R. was able to register three objects initially and recall two out of the three a few minutes later, count forward from memory six digits and backwards three digits, and recall the month and day of a family member's birthday, the month and day of his birthday, and the name of his school. (Doc. 18-1, p. 131). Consequently, Dr. Kennon opined that B.R. had an average level of intellectual functioning. (Doc. 18-1, p. 131).

Dr. Kennon explained that she reviewed and considered the medical evidence in the record provided by the Disability Determination Services in her overall assessment of B.R. Based on her review, Dr. Kennon opined that B.R. was "able to understand, and carry out, but may not remember instructions;" "unable to sustain concentration and persist in a work related activity at a reasonable pace;" "likely unable to unable to [sic] maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public;" "likely not able to deal with normal pressures in a competitive work setting;" and "likely not able to manage his own funds." (Doc. 18-1, p. 131). Dr. Kennon's diagnostic impressions were other psychotic disorder, ADHD combined typed, nightmare disorder, and speech issues. (Doc. 18-1, p. 131). Dr. Kennon recommend that B.R. undergo speech therapy. (Doc. 18-1, p. 132).

## Analysis

The first issue Ms. James raises involves the ALJ's treatment of Dr. Kennon's psychological evaluation of B.R. at the request of Disability Determination Services. Ms. James argues that the ALJ "failed to consider the evaluation and failed to mention the evaluation." (Doc. 13, p. 12).

The record contradicts Ms. James's argument. In his written opinion, the ALJ mentioned Dr. Kennon's evaluation three times. The ALJ first mentioned Dr. Kennon's evaluation in his analysis of the severity of B.R.'s speech impairment. The ALJ stated:

> Martha Kennon, Ph.D. found the claimant's speech difficult to understand with mispronunciations in in November 2017 (Exhibit 6F/6), and she diagnosed the claimant with "speech issues" without associated functional limitations. Furthermore, Dr. Kennon apparently evaluated the claimant using adult criteria instead the child criteria, rendering her opinion questionable (Exhibit 6F/F).

(Doc. 9-3, p. 15). Next, the ALJ mentioned Dr. Kennon's evaluation in his discussion of Ms. James's statements about the intensity, persistence, and limiting effects of B.R.'s symptoms. (Doc. 9-3, p. 17). The ALJ noted that "[o]nly one medical record was generated after the claimant's application for benefits, and it consisted of a Mental Medical Source Statement that was erroneously written for an adult rather than a child (Exhibit 6F). The claimant's representative voiced concern at the hearing over the appropriateness of this statement, and I concur." (Doc. 9-3, p. 17). Finally, in the ALJ's summary of the administrative evidence, he remarked that "a Mental Medical Source Statement was erroneously written for an adult rather than a child (Exhibit 6F)." (Doc.

9-3, p. 18).  The ALJ, once again, pointed out that Ms. James's attorney had concerns about Dr. Kennon's statements, but that he "admitted this evidence at the hearing" although the ALJ "agree[d] that [Dr. Kennon's] statement ha[d] no essential value given the enormity of the error." (Doc. 9-3, p. 18).

The ALJ correctly pointed out that Ms. James's attorney expressed concern about Dr. Kennon's evaluation at the administrative hearing.  Ms. James's attorney stated:

> [T]hat evaluation probably – not probably, but it should have contained a child mental source statement instead of an adult mental source statement. . . . I'm not really objecting.  I just want to note my concern for the record.

(Doc. 9-3, p. 46).  The ALJ placed Dr. Kennon's report in the record but deemed it "pretty much a worthless examination."  (Doc. 9-3, p. 46).

It is difficult to reconcile Ms. James's criticism of the ALJ's treatment of Dr. Kennon's opinion in this proceeding, given the concerns she expressed to the ALJ at the administrative hearing.  Setting aside the inconsistency for a moment, the Court notes that, given the Supreme Court's statement in *Sullivan v. Zebley* that "a child is entitled to benefits if his impairment is as severe as one that would prevent an adult from working," 493 U.S. at 529, Dr. Kennon's opinions regarding B.R.'s ability understand and remember instructions, sustain concentration and persist in a work-related activity at a reasonable pace, maintain effective social interaction on a consistent and independent basis, and deal with normal pressures in a competitive setting are not worthless.  Those observations have some probative value relating to B.R.'s limitations in functioning that result from his

medically determinable impairments.  20 C.F.R. § 416.924a(b)(2).  And Dr. Kennon's

opinions regarding those factors are largely consistent with the ALJ's findings.  Dr.

Kennon found that B.R. was able to understand and carry out instructions, (Doc. 18-1, p.

131), and the ALJ found that B.R. was less than marked in acquiring and using

information and attending and completing tasks, (Doc. 9-3, p. 19).[5]  Dr. Kennon

determined that B.R. was "likely unable to unable to [sic] maintain effective social

interaction on a consistent and independent basis," (Doc. 18-1, p. 131), and the ALJ

determined that B.R. had marked limitations in interacting and relating with others, (Doc.

9-3, p. 21).[6]

Still, in evaluating functional reports to assess the effects of a child's impairments

on his functioning, an ALJ must consider "the standards used by the person who gave us

_____

[5] The ALJ properly considered a report from B.R.'s teacher in reaching this conclusion.  20 C.F.R. § 416.924a(a)(iii).

[6] The ALJ based his determination of B.R.'s marked limitation in interacting with others on Ms. James's testimony and school records reflecting two suspensions.  The ALJ also cited a report from a classroom teacher that indicated that B.R. did not have problems interacting with others.  (Doc. 9-3, p. 21).  In reaching his conclusion, it was appropriate for the ALJ to consider Dr. Kennon's opinions regarding B.R.'s speech because "communication is essential to both interacting and relating," and the interacting domain "considers the speech and language skills children need to speak intelligibly and to understand and use the language of the community."  (Doc. 9-3, pp. 20-21) (citing 20 C.F.R. § 416.926a(i)); *see* 20 C.F.R. § 416.926a(i)(2)(iv) (identifying as an age group descriptor, "You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand."); 20 C.F.R. § 416.926a(i)(3)(vi) (listing as an example of limited functioning in interacting and relating with others, "You have difficulty speaking intelligibly or with adequate fluency.").  Any error in the ALJ's failure to list Dr. Kennon's opinion regarding B.R.'s speech in the evidence that he considered regarding the interacting and relating with others domain is harmless because the ALJ found that B.R. had a marked limitation in this domain, and the ALJ considered Dr. Kennon's opinion regarding B.R.'s speech elsewhere in his opinion.  (Doc. 9-3, p. 15).

the information."   20 C.F.R. § 416.924a(b)(3)(ii).   Consistent with the concern that counsel for Ms. James expressed at the administrative hearing, the ALJ properly considered the fact that Dr. Kennon used an adult standard rather than a standard for a child.

At step three the ALJ had to determine whether B.R. had impairments or a combination of impairments that met or medically equaled the severity of a listing.   20 C.F.R. § 416.924(d).   To accomplish this, the ALJ had to determine whether B.R. had marked limitations in two domains or an extreme limitation in one domain by comparing B.R.'s performance to the performance of other children of the same age who do not have impairments.   20 C.F.R. § 416.926a(a).   The ALJ properly followed the regulations that govern determinations of disability in children.   Ms. James argument concerning the ALLJ's treatment of Dr. Kennon's opinion is not persuasive.

Ms. James argues more broadly that the ALJ's decision is not based on substantial evidence because the ALJ did not consider Dr. Kennon's opinion. (Doc. 13, p. 23; Doc. 17, pp. 11-12).   Ms. James's briefs do not provide substantive analysis of this purported error.   The argument is not persuasive, given the Court's finding that the ALJ properly followed the regulations concerning disability determinations for children, that counsel's positions here and in the administrative hearing are inconsistent, and that possible error regarding the ALJ's treatment of Dr. Kennon's opinions is harmless.

The Court has reviewed the evidence in the administrative record and concludes that substantial evidence in the record supports the ALJ's conclusion that B.R. was not disabled from September 13, 2017, to the date of the ALJ's opinion, October 10, 2019.

### Conclusion

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this March 25, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE